## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD KLINMAN,** : | **CIVIL ACTION** |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| **JDS UNIPHASE CORPORATION,** : | |
| Defendant : | **NO.  05-2066** |

### MEMORANDUM and ORDER

PRATTER, DISTRICT JUDGE                                                                                                        JULY 6, 2006

Plaintiff Richard Klinman filed a complaint in the Court of Common Pleas for Lancaster County on March 28, 2005 alleging that his former employer, Defendant JDS Uniphase Corporation ("JDSU"), violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS. STAT. ANN. § 951, *et seq.*, by terminating his employment allegedly based on his age.  JDSU timely removed the litigation to federal court and subsequently filed a Motion for Summary Judgment, which Mr. Klinman opposed.   The parties made well-presented oral argument on the issues to the Court on May 4, 2006.  For the following reasons, the Court will deny JDSU's Motion for Summary Judgment.

### I.  FACTS AND PROCEDURAL HISTORY

JDSU designs and manufactures optical technology products for fiberoptic communications and other various markets.  In the fall of 2002, JDSU purchased the Trident line of products from OptronX, a company located in Allentown, Pennsylvania.  In September 2002,

Mr. Klinman, an OptronX employee, then age 57, was offered a job with JDSU by Ronald Genova, JDSU's vice president for its telecommunications business. Mr. Klinman accepted the position with JDSU as an electrical design engineer in the Transmission Products Group, one of three groups within JDSU that made products for the tele-communications industry. Mr. Klinman served as the senior design engineer for the Trident line and also performed various other duties. The JDSU Transmission Products Group had three facilities in the United States which fell under Mr. Genova's management: the Allentown site where Mr. Klinman worked, a site in Horsham, Pennsylvania, and a site in Melbourne, Florida. While at JDSU, Mr. Klinman's supervisor was Brian Owen.

The parties agree that JDSU, in order to respond to industry-wide declining market conditions, began a series of cost reductions, including significant reductions in personnel. In May 2003, JDSU began downsizing its telecommunications research and development budget at its Allentown facility. JDSU management, and specifically Mr. Genova, evidently reviewed further ways to cut its budget, and determined that the Trident line, and Mr. Klinman's position in particular, were the logical project and corresponding position to eliminate.

Specifically, according to JDSU, at the time it decided to eliminate it, the Trident transponders line had already progressed from the research and development stage to production and was being dismantled. The Trident line apparently produced revenues well below those forecasted at the time of the acquisition. JDSU alleges that, because no new Trident modules would be produced, Mr. Klinman, as lead engineer for those modules, would no longer be needed as part of the workforce. Mr. Klinman alleges that Mr. Genova told him his termination was partially based on Mr. Klinman's high salary. Mr. Genova denies making such a statement to

2

Mr. Klinman.  At the time Mr. Klinman was terminated, two other positions relating to the Trident line, both filled by men in their 30's, were also eliminated.[1]

On April 23, 2003, eight months after he was hired by JDSU, Mr. Klinman was notified verbally that his position was at risk and that his employment would likely be terminated the next month.  Mr. Klinman received a May 23, 2003 letter from Mr. Genova stating that, due to declining market conditions, Mr. Klinman's termination date was set for June 27, 2003.  Mr. Klinman was officially terminated on that date, at which time he was 58-years-old.

Mr. Klinman initiated a charge with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission on July 29, 2003, alleging that JDSU illegally discriminated against him on the basis of his age.  The EEOC subsequently issued Mr. Klinman a right-to-sue letter.  Mr. Klinman then timely filed this suit in the court of common pleas, claiming that JDSU violated the ADEA and PHRA when it allegedly terminated him based on his age.  JDSU then removed the lawsuit to federal court.  JDSU filed a motion for summary judgment, which Mr. Klinman opposed.  For the following reasons, the Court finds that there are genuine issues of material fact and, thus, JDSU's Motion for Summary Judgment must be denied.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[1] JDSU eliminated the position of David Massengale, who was responsible for designing the Trident circuit board, and of Chris Milne, who did software programming for new Trident Products.  At the time, Mr. Massengale was 38 years old, and Mr. Milne was also in his 30's.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility to inform the district court of the basis for the motion and to identify those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented in the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255; USX Corp v. Liberty Mut. Ins. Co., Nos. 04-1277 & 04-1300, 2006 U.S. App. LEXIS 8702, at *12-13 (3d Cir. Apr. 10, 2006).

### B. Age Discrimination Claims

To succeed with an age discrimination claim under the ADEA or the PHRA, a plaintiff

using indirect evidence, as Mr. Klinman does here, must first establish a *prima facie* case of age discrimination by showing that: (1) he is within the protected age group of 40 and over; (2) he was qualified for the position in question; (3) he was the subject of an adverse employment action; (4) under circumstances giving rise to an inference of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Fasold v. Justice, 409 F.3d 178, 183-84 (3d Cir. 2005). When an employee is terminated during a reduction in force ("RIF"), as is the case here, the fourth element becomes whether the employee can show "that the employer retained someone similarly situated to him who was sufficiently younger." Anderson v. Conrail, 297 F.3d 242, 250 (3d Cir. 2002).

In order to show that a retained employee was "similarly situated," the plaintiff does not have to show that the employee was identically situated. Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 305 (3d Cir. 2004). Rather, in order to determine who might qualify as a similarly situated employee, the Court must "look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace."[2] Id.; Larrison v. Lucent Technologies Inc., No. 02-4082, 2004 U.S. Dist. LEXIS 27246, at *17 (D.N.J. Aug. 20, 2004). Such an evaluation "requires the court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner." Monaco, 359 F.3d at 305. The Third Circuit Court of Appeals has noted that, in order for the plaintiff to satisfy the "sufficiently younger" standard, "there is no particular age difference that must be shown, but while different

---

[2] The plaintiff in Monaco brought his claim under the New Jersey Law Against Discrimination ("NJLAD") and not under the ADEA, as in this case. In explaining the standard for determining whether an employee is "similarly situated" under the NJLAD, the court of appeals did "not suggest that the standard would be different under the ADEA," but rather "merely recognize[d]" that Monaco's claims for age discrimination was solely under the NJLAD. Monaco, 359 F.3d at 305 n.12.

courts have held . . . that a five year difference can be sufficient, . . . a one year difference cannot." Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 236 (3d Cir. 1999) (internal citation and quotations omitted).

Once the plaintiff has established a *prima facie* case of age discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). This burden is "relatively light," and the employer can meet the burden by "introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Id. After the employer satisfies its burden of production, the plaintiff must respond by citing to evidence which shows that the proffered legitimate explanation for the adverse action is actually pretextual. Id.

Here, if JDSU can proffer a legitimate, non-discriminatory reason for Mr. Klinman's termination, in order for Mr. Klinman to create a genuine issue of material fact, he must "point to some evidence, direct or circumstantial, from which a factfinder reasonably could either (1) disbelieve the JDSU's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of JDSU's action." Id. at 764. Mr. Klinman "must do more than show that [JDSU] was 'wrong or mistaken' in deciding to lay him off." Tomasso v. Boeing Co., No. 04-4657, 2006 U.S. App. LEXIS 9734, at *10 (3d Cir. Apr. 19, 2006). He must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Fuentes, 32 F.3d at 765.

It is not necessary for Mr. Klinman to offer evidence sufficient to discredit all of the rationales advanced by JDSU. Id. at *11. Rather, if Mr. Klinman "manages to cast substantial doubt on a fair number of them, [he] may not need to discredit the remainder." Fuentes, 32 F.3d at 764. That is, "the rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales." Id. at *12.

### C.  McDonnell Douglas Analysis

#### 1.  Prima Facie Evidence of Discrimination

JDSU argues that summary judgment is proper at this time because although Mr. Klinman can establish the first three elements of a *prima facie* claim of discrimination, he cannot show the fourth element (i.e., that JDSU retained sufficiently younger, similarly situated employees). JDSU contends that no one was hired to fill Mr. Klinman's former position, and Mr. Klinman's former duties were divided among a number of JDSU employees after his departure.

In contrast, Mr. Klinman argues that he can establish a *prima facie* claim of discrimination because JDSU did in fact retain sufficiently younger, similarly situated employees, namely Karen Glover and Matthew George. Specifically, Mr. Klinman alleges that Matthew George, then age 34, who was also a former OptronX employee hired by JDSU to work at the Allentown facility after the acquisition of the Trident line, was retained as an employee of JDSU while Mr. Klinman was terminated. Mr. Klinman was 58-years-old at the time he was terminated, 24 years older than Mr. George. This age differential satisfies the requirement for a discrimination claim that the employer retain an employee who is "sufficiently younger" than the terminated employee. Karen Glover was a JDSU employee who worked at the JDSU Melbourne,

Florida site and who, according to Mr. George's deposition testimony, was "in her thirties" at the time Mr. Klinman was laid off. Here, Mr. George's supposition that Ms. Glover was "in her thirties" at the time Mr. Klinman's employment was terminated is insufficient to establish that Ms. Glover was sufficiently younger than Mr. Klinman.

Thus, the important examination becomes that related to Mr. George. As stated above, the Court must look to the Monaco factors to determine whether Mr. George was "similarly situated" to Mr. Klinman.[3]

**(1) Job Title:** Mr. Klinman held the title of Hardware Development and Research Engineer (Electrical Design) (Level 4), and Mr. George was a Product Applications Engineer.

**(2) Salary:** Mr. Klinman ($134,000) was paid $45,000 more per year than Mr. George ($89,000).

**(3) Job Function:** Mr. Klinman and JDSU are in sharp disagreement as to the scope of Mr. Klinman's job duties as an employee of JDSU. Mr. Klinman states that he performed work as a designer for 20% of his time, with applications work, customer interface/marketing and data sheets taking up 70% of his time. Mr. George and Mr. Owen, Mr. Klinman's direct supervisor, both agree that part of Mr. Klinman's duties was applications work, which was also performed by Mr. George. In contrast, Mr. Genova, vice-president of JDSU and the JDSU representative

---

[3] Even if Mr. Klinman arguably has shown that Ms. Gover was sufficiently younger than he was at the time of his termination, Mr. Klinman has not carried his burden with respect to showing that Ms. Glover was a similarly-situated employee who was retained when he was terminated. That is, although Mr. Klinman has offered minimal evidence regarding her job duties – only that she worked with the JDSU documents and spec sheets and took over Mr. Klinman's duties which fit into that category – Mr. Klinman has offered no evidence regarding Ms. Glover's salary, job title, or supervisory responsibility. From this record, the Court cannot conclude that there is a genuine issue of material fact as to whether Ms. Glover was similarly situated to Mr. Klinman.

8

who made the decision to terminate Mr. Klinman, only categorizes Mr. Klinman's duties as engineer for the design and development of Trident transponders.

Both at oral argument and in JDSU's responses to Mr. Klinman's first set of interrogatories, JDSU indicated that Mr. Klinman was a highly skilled engineer, but that only a small portion of his duties required those skills. JDSU also asserts that the non-engineering, time-filling tasks that Mr. Klinman was performing because there was a relative dearth of engineering work were, in any event, not occupying Mr. Klinman's time.

With respect to Mr. George's job duties, Messrs. Klinman, Owen, Genova, and George himself agree that Mr. George was an applications engineer. According to Mr. George, his job entailed such things as traveling, interfacing with clients, setting up and testing equipment and resolving customer issues. Mr. Genova characterized Mr. George's duties as being an applications engineer who interfaced with customers on Trident modules, and then moved onto other JDSU products.

There is some disagreement among the parties as to how Mr. Klinman's duties were divided after he was terminated. Mr. Klinman alleges that his duties were performed by Matthew George and Karen Glover. Mr. George denies that he took over any of Mr. Klinman's duties once Mr. Klinman was terminated from JDSU. Mr. Owen, who, at least for sometime, was Mr. George's direct supervisor, expressed surprise that Mr. George denied taking over any of Mr. Klinman's job responsibilities, stating that Mr. George did take over certain responsibilities. Specifically, Mr. Owen stated that Mr. George took over interfacing with client, marketing, and handling customer problems that Mr. Klinman had previously performed. JDSU also asserts that some of Mr. Klinman's engineering duties were subsumed by Clarence Williams, who was 57-years-old at the time Mr. Klinman was terminated.

**(3) Supervisory Responsibility:** There is no indication on the record before the Court that either Mr. Klinman or Mr. George had any supervisory responsibilities.

**(4) Other Factors:** The Court has not determined that there are any other factors – and the parties have not directed the Court's attention to any such factors – deserving of consideration on the issue of whether Mr. George and Mr. Klinman were similarly situated.

Here, although Mr. George and Mr. Klinman were not identically situated at the time Mr. Klinman left JDSU, Mr. Klinman does not have to make that showing. At this point, Mr. Klinman simply has to show that he and Mr. George were similarly situated and that Mr. George was retained while Mr. Klinman was terminated. Although Mr. George and Mr. Klinman did not share the same job title, their job duties were similar. Specifically, although Mr. Genova goes to lengths to categorize Mr. Klinman's duties as strictly engineering and downplay his other duties, Mr. Klinman and Mr. Owen agree that Mr. Klinman had varied duties and was an applications engineer (as was Mr. George) in practice if not in title. Also, Mr. Owen also testified that Mr. Klinman interfaced with the clients, and, specifically, one major client (Nortel) regarding the Trident line. Mr. Genova stated that Mr. George also did client interface with the Trident line. Based on the available information, although Mr. Klinman's duties were somewhat broader that Mr. George's, Mr. Klinman and Mr. George were similarly, albeit not identically, situated with respect to their job duties at the time Mr. Klinman was terminated and Mr. George retained.

As stated above, the 24 year age difference between Mr. George and Mr. Klinman is enough to satisfy the "sufficiently younger" prong. Although it is an admittedly close issue, the Court finds that, taking the evidence in a light most favorable to Mr. Klinman, Mr. George is also similarly situated to Mr. Klinman. Mr. George and Mr. Klinman had different job titles and salaries, yet they were performing similar job duties. On balance, these considerations weigh

10

heavily in favor of a finding that Mr. Klinman and Mr. George were similarly situated.

### 2. Legitimate, Non-Discriminatory Reason for Termination

JDSU argues that, even if Mr. Klinman can show a *prima facie* case of discrimination, JDSU can carry its burden of articulating legitimate, non-discriminatory reasons for laying off Mr. Klinman. Specifically, JDSU asserts that it terminated Mr. Klinman for "economic and cost-cutting reasons." The company needed to reduce its costs and the Trident line no longer needed design engineers, according to JDSU.

### 3. Evidence of Pretext

JDSU argues that, even if Mr. Klinman can make a *prima facie* showing of discrimination, the record is devoid of any evidence of pretext. JDSU contends that all of the evidence shows that the decision to terminate Mr. Klinman was based on purely economic reasons, namely, the company needed to reduce costs and the Trident line no longer needed a senior design engineer, and thus, Mr. Klinman, as the Trident senior design engineer was terminated. JDSU directs the Court's attention to the first RIF round, in which Mr. Klinman and two other employees who worked on the Trident line, both in their 30's, were terminated (which was followed by two other reductions in force and, ultimately, the closure of the Allentown facility). JDSU also asserts that there is no evidence of pretext because Mr. George was one of a number of individuals who may have performed some of Mr. Klinman's duties in addition to their own. JDSU argues that this evidence does not rise to the level of "demonstrating weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions."

Mr. Klinman, in contrast, asserts that there is clear evidence of pretext because Mr. Klinman had an excellent work history which went unconsidered by JDSU and also that JDSU's economic rationales were merely justifications triggered by the exigencies of this litigation.

Here, JDSU and, in particular, Mr. Genova, go to great lengths to narrowly categorize Mr. Klinman's position and duties at JDSU. JDSU argues strenuously that Mr. Klinman's duties were only to include those of a Trident senior design engineer, and any other job duties that Mr. Klinman may have performed were simply "filler" which a man of Mr. Klinman's expertise should not have been performing. Mr. Klinman, on the other hand, has produced evidence showing that his job duties were much broader, including, in addition to performing duties as the Trident senior design engineer, working with data sheets, interfacing with customers, and small design changes. Mr. Klinman also produced evidence which indicated that he performed some work on expanding JDSU product lines as well as work with a particularly large client, Nortel. The parties do not disagree, however, that Mr. Klinman was a highly competent and valued employee.

Based on the above, taking all reasonable inferences in favor of Mr. Klinman, a reasonable factfinder could disbelieve and find incoherencies and inconsistencies in JDSU's articulated reasons for the termination. JDSU alleges that it terminated Mr. Klinman for economic reasons because the senior design engineer position for the Trident line was no longer needed, yet Mr. Klinman has proffered evidence to show that his job was much broader than simply a design engineer for the Trident line. Moreover, there is evidence that the Trident line still required at least some design engineering because, as admitted by JDSU, when there was advanced action, such as a design change, those issues were given to Mr. George or Mr. Williams. A reasonable fact-finder could determine that doubt is visited upon JDSU's proffered non-discriminatory economic justifications by virtue of the fact that it would not make economic sense to terminate a much-valued employee whose job included very little of the product line which was eliminated. Thus, the Court finds that Mr. Klinman has carried his burden at this

12

stage and the case must be tried to a jury.

### III. CONCLUSION

Based on the foregoing, the Court finds that Mr. Klinman has raised a genuine issue of material fact as to whether JDSU's proffered rational for firing Mr. Klinman was merely pretextual for terminating him for discriminatory reasons, and JDSU's Motion for Summary Judgment must be denied.

BY THE COURT:

_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD KLINMAN,** | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **JDS UNIPHASE CORPORATION,** | : | |
| Defendant | : | NO. 05-2066 |

**ORDER**

AND NOW, this 6th day of July, 2006, upon consideration of Defendant's Motion for Summary Judgment (Docket No. 18), Plaintiff's Response thereto (Docket No. 19), and Defendant's Reply (Docket No. 25), it is hereby ORDERED that Defendant's Motion is DENIED.

IT IS FURTHER ORDERED that the case shall proceed in accordance with the practices and procedures set forth in the Court's August 1, 2005 Scheduling Order (Docket No. 8) and on the following schedule:

1. All trial exhibits shall be marked and exchanged on or before September 27, 2006.

2. All parties are to prepare and file with the Clerk of Court their Pretrial Memoranda, in accordance with this Order and Local Rule of Civil Procedure 16.1(c) as follows:

   a. Plaintiff: on or before October 4, 2006.

   b. Defendant: on or before October 11, 2006.

One (1) copy of each Pretrial Memorandum shall be served on the Court (Chambers, Room 5118) when the original is filed.

3. A final pretrial conference will be held with the Honorable Gene E.K. Pratter on October 18, 2006, at 2:00 p.m. in Chambers, Room 5118, United States Courthouse. Lead trial

counsel is required to appear at the conference. If trial counsel is on trial in another matter, an attorney in his or her office who is thoroughly familiar with this case is required to appear at the conference.

4. The case will be placed on the Court's trial pool list on October 24, 2006. The case will be tried to a jury. The estimated trial time is four days (4) days, including the time needed to select a jury.

BY THE COURT:

S/Gene E.K.Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE